**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **JOHN A. REESE,** | ) |
| | ) |
|   **Plaintiff,** | ) |
| | ) |
|    **vs.** | )  **CAUSE NO.  1:07-cv-1663-WTL-JMS** |
| | ) |
| **MICHAEL J. ASTRUE, Commissioner of** | ) |
| **the Social Security Administration,** | ) |
| | ) |
|   **Defendant.** | ) |

**ENTRY REVIEWING COMMISSIONER'S DECISION**

On November 10, 2004, an inebriated John Reese walked in front of a moving train.  He suffered a transverse fracture of his left acetabulum,[1] vertical sheer disruption of his right sacroiliac joint,[2] laceration of his right kidney, laceration of his liver, a retroperitoneal hematoma,[3] and laceration of his head without acute intracranial abnormality.  He was hospitalized until November 22, 2004, when he was discharged to an acute rehabilitation unit.

---

[1] The acetabulum is "the hemispheric or cup-shaped hollow in the side of the hip bone which receives the rounded upper end (the head) of the femur or thigh bone and with it forms the ball-and-socket joint of the hip, i.e., the hip joint."  J. E. Schmidt, *Attorneys' Dictionary of Medicine and Word Finder* at A-55 (2007).  A transverse fracture is one "in which the line of break is at right angles to the length (or long axis) of the bone."  *Id*. at T-210.

[2] The sacroiliac joint consists of the connection between the sacrum (the lowest part of the spine) and the ilium (the upper part of the hip bone).  The sacrum is a wedge-shaped bone that fits into the wedge-shaped opening between the back ends of the two hip bones.  It is held in place by "strong ligaments, strong bands of connective tissue."  "The sacroiliac joint is an important structure, since it supports the spine and, therefore, the entire body above the hips." *Attorneys' Dictionary of Medicine* at S-7.

[3] A mass of blood or swelling of tissues that is located between the peritoneum (the lining of the abdomen) and the abdominal wall.  "The condition may result from an injury which ruptures a blood vessel and allows the blood to escape into the tissue."  *Attorneys' Dictionary of Medicine* at H-58 (hematoma), P-189 (peritoneum), R-131 (retroperitoneal), and R-132 (retroperitoneal space).

He apparently made good progress there and was released after only two days to return home in the care of his mother.  In December 2004, Mr. Reese applied for Social Security disability benefits under the Supplemental Security Income program and the Disability Insurance Benefits program, (R. 84),[4] alleging that his accident injuries, pre-existing arthritis in his knees and hips, and mental problems rendered him disabled.  On April 5, 2005, his claims were denied after initial review by the state agency,[5] (R. 34, 36-41), and denied again on June 9, 2005, after reconsideration review, (R. 35, 43-45).[6]  He requested and received a hearing before an administrative law judge ("ALJ") on February 27, 2006.  (R. 47, 303).  The ALJ denied Mr. Reese's claims by written decision on October 25, 2007, (R. 11, 13), and the Social Security Administration's Appeals Council denied his request for review of that decision, (R. 6, 9), which rendered the ALJ's decision the final and appealable decision of the Social Security Administration ("SSA") on his claims.  Mr. Reese then filed the present action for judicial review of the decision pursuant to 42 U.S.C. § 405(g).

Our standard of review is deferential:  courts must uphold decisions of the Commissioner if his factual findings are supported by substantial evidence in the record and no material error of

---

[4] Mr. Reese applied for SSI benefits on December 16, 2004.  A protective filing for DIB benefits was entered on January 7, 2005, with a protective date of December 31, 2004.  (R. 84).

[5] Under an arrangement with the federal Social Security Administration, initial and reconsideration reviews in Indiana are performed by an agency of the state government:  the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration.  20 C.F.R. Part 404, Subpart Q.  Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal Social Security Administration.

[6] The citations are to the reports of the state agency's denial of DIB benefits.  The reports of the denials of SSI benefits are missing from the Record, (R. 2-3), but the table-of-contents descriptions provide their dates.

law has occurred.  42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004);

*Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a

scintilla, but less than a preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026,

1029 (7th Cir. 2001).  If the evidence is sufficient for a reasonable person to conclude that it

adequately supports the Commissioner's decision, then it constitutes substantial evidence.

*Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v.*

*Barnhart*, 360 F.3d 751, 758 (7th Cir. 2004).  This limited scope of judicial review derives from

the principle that Congress has designated the Commissioner, not the courts, to make disability

determinations.

> In reviewing the decision of the ALJ, we cannot engage in our own analysis of
> whether [the claimant] is severely impaired as defined by the SSA regulations.
> Nor may we reweigh evidence, resolve conflicts in the record, decide questions of
> credibility, or, in general, substitute our own judgment for that of the
> Commissioner.  Our task is limited to determining whether the ALJ's factual
> findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.

Under the Social Security Act, disability is defined as the "inability to engage in any

substantial gainful activity by reason of any medically-determinable physical or mental

impairment which can be expected to result in death or has lasted or can be expected to last for a

continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382a(3)(A).  A

person will be determined to be disabled only if his impairments "are of such severity that he is

not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).  The combined effect of all of a

claimant's impairments shall be considered throughout the disability determination process.  42

USC §§ 423(d)(2)(B) and 1382a(a)(3)(G).

The SSA has implemented these statutory standards in part by prescribing a "five-step sequential evaluation process" for determining disability.  20 C.F.R. §§ 404.1520 and 416.924. If disability status can be determined at any step in the sequence, an application will not be reviewed further.  *Id.*  At the first step, if the claimant is currently engaged in substantial gainful activity, then he is not disabled.  At the second step, if the claimant's impairments are not severe, then he is not disabled.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and 416.924(c).  Third, if the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions included in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, then the claimant is deemed disabled.  The Listing of Impairments are medical conditions defined by criteria that the Administration has pre-determined are disabling. 20 C.F.R. § 404.1525.  If the claimant's impairments do not satisfy a Listing, then his residual functional capacity ("RFC") will be determined for the purposes of the next two steps.  RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations.  20 C.F.R. §§ 404.1545 and 416.945.  At the fourth step, if the claimant has the RFC to perform his past relevant work, then he is not disabled.  Fifth, considering the claimant's age, work experience, and education (which are not considered at step four), and his RFC, he will not be determined to be disabled if he can perform any other work in the relevant economy.

The burden rests on the claimant to establish steps one through four; the burden then shifts to the Commissioner at step five to establish that there are jobs that the claimant can perform in the national economy.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  If a

claimant has only exertional limitations, the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids"), may be used at step five to arrive at a disability determination. The grids are tables correlating a claimant's age, work experience, education, and RFC with predetermined disabled or not-disabled findings. 20 C.F.R. §§ 404.1569 and 1569a. If a claimant has non-exertional limitations or exertional limitations that restrict the full range of employment opportunities at his RFC level, then the grids may not be used and a vocational expert must testify regarding the numbers of jobs in the economy for a person with the claimant's particular vocational and medical characteristics. *Id.*; *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993). The grid result, however, may be used as an advisory guideline in such cases. 20 C.F.R. § 404.1569.

After his collision with the train on November 10, 2004, Mr. Reese underwent an open reduction and internal fixation of his right sacroiliac joint, his left acetabular fracture, and his left posterior column pelvis fracture at Wishard Hospital in Indianapolis. On his discharge to the acute rehabilitation center on November 22nd, he was non-weight-bearing in both lower extremities and was wheelchair bound. He was released from the center to return home on November 24th and had a follow-up visit with his orthopedic surgeon, Dr. Rena Stewart, on November 30th. On December 16th, he submitted an application for disability benefits with the SSA. He had a follow-up visit with Dr. Stewart in January 2009 and started a course of physical therapy at Wishard Hospital on February 25th, which was expected to last six to eight weeks. The state agency reviewing Mr. Reese's application for disability benefits sent Mr. Reese to Dr. Phillip S. Budzenski for an examination on March 1st. Dr. Budzenski noted that he was currently in a wheelchair but could transfer himself; his hip flexion was normal but he was unable to perform hip extensions; and knee flexion was limited. There are a series of physical

therapy notes through May 9th when he was discharged after having reached a plateau in his status. His disability claims were denied initially on April 5th and after reconsideration on June 9th. At the February 2006 hearing before the ALJ, Dr. Arthur Lorber, the medical expert, testified, as did Gail Corn, the vocational expert. After the hearing, the ALJ arranged for Mr. Reese to undergo a consulting mental examination in May 2006 by Dr. Jerome Modlick and an orthopedic consulting examination in August by Dr. Alois E. Gibson. After offering Mr. Reese an opportunity to submit comments on the reports of these examination, the ALJ issued her denial decision in October 2007.

The ALJ found, at step one, that Mr. Reese had not engaged in substantial gainful activity since his accident. At step two, she found that Mr. Reese had the following impairments which were severe individually or in combination: (1) osteoarthritis of the knees; (2) status post-surgical repairs of his left acetabulum and right iliac joint with residuals; (3) and early degenerative changes of his cervical spine. She found that Mr. Reese's depressive disorder, not otherwise specified, and alcohol dependence by history were not severe impairments. At step three, she found that Mr. Reese did not have an impairment or combination of impairments that met or equaled any of the Listings of Impairments. She specifically analyzed Mr. Reese's osteoarthritis and accident-related impairments under Listing 1.02A of the musculoskeletal listings (major dysfunction of a joint(s) from any cause, involving one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle)); his cervical impairment under Listing 1.04 (disorders of the spine); and his mental impairments under Listing 12.04 of the mental disorders Listings (affective disorders).

For the purposes of steps four and five, the ALJ found that Mr. Reese had the RFC to

perform generally at the sedentary level with the following additional restrictions:

- Lift and carry up to 10 pounds occasionally, ledgers and files frequently.
- In an 8-hour day, sit for 6 hours, stand for 1 hour, walk for 1 hour, and allowed to alternate positions for 5 non-consecutive minutes every hour.
- Use upper extremities to push and pull up to 10 pounds occasionally.
- Never use feet to push and pull controls.
- Never climb ladders, ropes, or scaffolds.  Occasionally climb ramps and stairs.
- Never balance on uneven terrain or on slippery or wet surfaces.
- Never crouch, kneel, or crawl; occasionally stoop.
- Never work at heights, around moving machinery, or on slippery or wet surfaces.

The ALJ found that, because Mr. Reese did not have a severe mental impairment, he had the capacity to perform "at least, simple, routine, repetitive tasks; make judgments commensurate with the functions of unskilled work; deal with changes in a routine work setting; and respond appropriately to supervisors, co-workers, and usual work situations."  (R. 22).  In arriving at his RFC finding, the ALJ analyzed the objective and opinion medical evidence of record and evaluated the credibility of Mr. Reese's assertions of the severity and functionally limiting effects of his subjective symptoms pursuant to the provisions of the SSA's regulations, *e.g.*, 20 C.F.R. 404.1529 and 416.929, and rulings, *e.g.*, S.S.R. 96-4p and 96-7p.[7]

Using this RFC at step four, the ALJ found that Mr. Reese was unable to perform his past relevant work as molder/operator, loader/unloader, or janitor because these jobs are classified at either the heavy or medium level as Mr. Reese actually performed them or as they are generally performed in the national economy, but he retained the capacity for only sedentary work.  At step five, the ALJ found that, because Mr. Reese's ability to perform all or substantially all of the exertional and non-exertional requirements of sedentary work was impeded by his

---

[7] The ALJ specifically found that Mr. Reese had no limitations on simple grasping; fine manipulation; reaching; handling; feeling; hearing; speaking; or working around chemicals, noise, humidity, dust, temperature extremes, fumes, or vibrations.

restrictions, the grid could be used for guidance only.  Relying on the testimony of a vocational

expert at the hearing, the ALJ concluded that Mr. Reese was capable of making a successful

adjustment to other work that exists in significant numbers in the national economy and was,

therefore, not disabled.

Mr. Reese asserts several errors in the ALJ's decision which we address in his order.

**1.   The ALJ's step-three finding deprived Mr. Reese of his Constitutional right to due process of law.**

In his opening brief, Mr. Reese first contends that he met his burden of proof by

presenting substantial evidence that his combined impairments met or equaled Listing 1.02A,[8]

and then argues that the ALJ denied him the fair consideration of his claim guaranteed by due

process because "the ALJ and her medical advisor, selected over objection for pro-agency bias,

argued with and rejected the treatment and examination medical-psychological evidence which

supported a finding of disability, ending by substituting their erroneous opinions for the opinions

of the claimant's treating primary care and orthopedic physicians."  (Plaintiff's Brief in Support

of Complaint (doc. 17) ("Brief") at 20-21).  He follows this statement not with a factually and

legally developed argument showing due-process deprivations but only with summary

descriptions of decisions that recognize due-process rights and/or violations of those rights in

disability determinations.  Not only does Mr. Reese fail to set forth in his opening brief any

standard for determining due-process violations in administrative proceedings, he fails to

demand any remedy for such deprivations beyond the grant of disability benefits to which he

otherwise would be entitled under the statutes and regulations.  Likewise, he specifies no due-

---

[8] Initially, we note that the standard on review is whether substantial evidence supports
the Commissioner's denial of benefits, not a plaintiff's claim for benefits.  Because substantial
evidence is less than a preponderance, these standards are not mutually exclusive.

process deprivations by the ALJ that differ from the errors he asserts under 42 U.S.C. § 405(g).

Whether administrative benefit determinations violate due process and, if so, whether a remedy

is available beyond the benefit at issue, are complex questions of fact and law, especially when

ALJ bias is alleged. *See*, *e.g.*, *Liteky v. United States*, 510 U.S. 540, 555-56 (1994); *Schweiker*

*v. Chilicky*, 487 U.S. 412 (1988). It is not a *per se* due-process violation for an ALJ to reject

evidence supporting a finding of disability, to decide not to give the opinions of treating

physicians controlling weight, to not specifically discuss all of the evidence, or to reject a

claimant's assertion that a medical expert has a pro-agency bias. The Court will not assume Mr.

Reese's burden to research the law of due process, search the record for possible violations, and

construct a focused, logical, and persuasive argument applying the law to the facts.

> In his Reply, Mr. Reese broadened his due-process argument:
>
>    Plaintiff is not contending that he was denied due process by the types of issues
> considered in *Keith v. Barnhart*, 473 F.3d 782 (7th Cir. 2007), defining denial of due
> process to include an ALJ's extreme conduct or personal bias or hostility toward a
> claimant. The type of denial of due process seen in the instant case is an institutional-
> agency wide [*sic*] policy and procedure of refusing to consider, or only selectively
> considering, the evidence so as to exclude from the ALJ's decision's [*sic*]
> consideration of all of the evidence which proves a claimant's disability.
>
>    This practice and procedure is seen in every ALJ denial decision. The agency
> simply pretends that there is no evidence in the record to prove the claimant's case.
> The agency persists in using this procedure despite its being repeatedly condemned
> by Seventh Circuit cases, cited by the Plaintiff's Brief at pages 2530-31, [*sic*] which
> have reversed denial decisions where the ALJ selected and discussed only the
> evidence that supported his denial decision.

(Plaintiff's Response to Defendant's Memorandum (doc. 19) ("Reply") at 4). While long on

charges, this argument is short on substance: not only did Mr. Reese fail to present the legal

standards for determining the issue, he failed to submit, cite, or even refer to any evidence of an

institutional or agency-wide policy and procedure by the SSA of refusing to consider evidence

favorable to claimants' disabilities.  Therefore, his argument is forfeited.

Mr. Reese has not demonstrated that the ALJ's decision, or the determination process in

his case, deprived him of due process.

**2.  The ALJ's finding that Mr. Reese's impairments did not meet or equal Listing 1.02A was erroneous.**

Mr. Reese asserts two errors in the ALJ's step-three finding.  First, he argues that the

ALJ was confused on the chronology of his use of assistive devices and that the correct

chronology proves that he satisfied the Listings.  Under Listing 1.02A, a claimant is presumed to

be disabled if he has major dysfunction of a joint or joints with "[i]nvolvement of one major

peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate

effectively . . . ."  20 C.F.R. Part 404, Subpt. P, Appendix 1, § 1.02.  Section 1.00B.2.b. defines

the inability to ambulate effectively (emphasis added):

> Inability to ambulate effectively means an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. *Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.*   *   *   *
>
> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Mr. Reese contends that the ALJ erroneously relied primarily on the testimony of the medical

expert, Dr. Lorber, that Mr. Reese did not meet the requirements of Listing 1.02A "because he

did not need an assistive device to ambulate for a period of twelve months (R. 323-323 [*sic*],
326).  The ALJ relied on Dr. Lorber's erroneous testimony in her Step 3 denial determination."
(Brief at 22).   Mr. Reese contends that the evidence actually demonstrates that he was
wheelchair bound from the date of his accident until his physical therapy ended in April 2005, a
period of about five months, and that he used a cane until eight months after his therapy ended,
for an additional eight months, for a total of thirteen months, thus satisfying Listing 1.02A.

There is no dispute that Mr. Reese underwent physical therapy between February and
April 2005, (R. 24), and that the ALJ credited the report that "until therapy ended, the claimant
was wheelchair bound", (*id.*).  She also credited Dr. Gibson's report that Mr. Reese said that he
was able to walk without a cane eight months after his therapy ended, (*id.*; R. 225), making
thirteen months after his accident when Mr. Reese was either wheelchair bound or using a cane.

However, Mr. Reese wrongly describes both Dr. Lorber's testimony and the ALJ's
reliance thereon.  He is also wrong on the standard for ineffective ambulation.  In the portions of
the hearing testimony that Mr. Reese cites, Dr. Lorber does not address Mr. Reese's use of
assistive devices after November 2004 as evidence of whether his accident-related impairments
met the Listings for a period of twelve months; instead, Dr. Lorber opines on the absence of both
assistive devices and treatment *before* his accident as an indication that his knee osteoarthritis
was not severe enough to satisfy the Listings.  (R. 319-27).  Neither does the ALJ's decision
indicate that she relied primarily on Dr. Lorber's testimony in making her step-three
determination:  the only mention of Dr. Lorber's testimony in relation to her Listing 1.02A
analysis is to specifically note *Mr. Reese's* focus on the testimony and to specifically explain that
she was not solely relying upon it.  (R. 20-21).

As quoted above, Section 1.00B.2.b. generally defines the inability to ambulate

11

effectively as the inability to walk without the assistance of a hand-held device or devices that limit the functioning of *both* upper extremities.  The consulting orthopedic surgeon's report — relied upon by both the ALJ and Mr. Reese as evidence of his use of assistive devices — records the following statement by Mr. Reese:

> Mr. Reese remained in Wishard Hospital for three weeks and was released and confined to a wheelchair until March of 2005.  He received physical therapy to reambulate between February of 2005 and April of 2005.  Later, he utilized *a cane* for approximately eight months.

(R. 225 (emphasis added)).  Mr. Reese cited no evidence that he required or used two canes, or any other device, that limited the functioning of both of his upper extremities for the eight months following physical therapy until he was able to walk unassisted.  We note that Mr. Reese testified that he has, in fact, used only one cane, not two.  (R. 336).  Thus, his use of one cane does not, without more, satisfy the definition of ineffective ambulation.  While § 1.00B.2.b. does not *require* the use of a walker, two crutches, two canes, or any other upper-extremities-limiting devices in order satisfy the definition of ineffective ambulation — it is only so defined "generally" and includes examples of other means to qualify — Mr. Reese relies only on his chronology of wheelchair and cane use to support his argument.  By contrast, and contrary to Mr. Reese's characterization, the ALJ cited several items of evidence in support of her Listings decision.  (R. 20-21).  In particular, she cited evidence from the eight-month period following Mr. Reese's therapy that she concluded tended to show effective ambulation by Mr. Reese.  For example, in April 2005, Mr. Reese was able to stand and walk for forty-five minutes; in April 2005, his therapist reported that there would be significant improvements in his gait quality if he were more compliant with the home exercise program; and, in May 2005, his gait was normal and he reported pain of only 2 to 4 on a scale of 10.  (*Id.*)

Mr. Reese has not shown that the ALJ's step-three determination relied primarily on erroneous testimony of Dr. Lorber regarding Mr. Reese's use of assistive devices following his accident; that the ALJ was confused about, or erroneously interpreted, evidence of Mr. Reese's use of assistive devices following his accident; or that the ALJ erroneously applied the ineffective-ambulation standard of Listing 1.02A.

The second error asserted by Mr. Reese in the ALJ's step-three determination is that she erroneously relied on Dr. Lorber's opinion that the absence of treatment showed that Mr. Reese's impairments were not severe enough to satisfy Listing 1.02A. Mr. Reese contends that Social Security Ruling ("SSR") 96-7p required the ALJ to first "take . . . steps to determine why he had not obtained medical treatment" before relying on the absence of treatment. (Brief at 24). Mr. Reese's argument fails on several points.

First, as explained above, the cited testimony of Dr. Lorber, (R. 320, 323, 326), refers to the absence of treatment of Mr. Reese's knee osteoarthritis *before* the accident as an indication of whether he satisfied the Listings, and Listing 1.02A requires evidence of ineffective ambulation. Yet Mr. Reese does not advance any evidence of ineffective ambulation before or after his accident in support of this argument other than his description of the chronology that was found inadequate above.

Second, the ALJ's decision does not mention Dr. Lorber's absence-of-treatment opinion in its step-three discussion.[9] There is no evidence that the ALJ relied upon, or even credited, Dr. Lorber's absence-of-treatment opinion regarding his pre-accident knee impairment in making her step-three determination. On review, the Court examines the ALJ's analysis and reasons

_____

[9] Tellingly, in making his argument, Mr. Reese cited the transcript of Dr. Lorber's testimony, but no portion of the ALJ's decision.

13

recorded in her written decision; we do not evaluate the entire Record for all possible errors that the ALJ could have made but did not.[10]

Third, the portion of SSR 96-7p relied upon by Mr. Reese does not require an ALJ, in all circumstances, to take affirmative steps to determine the reason why a claimant did not obtain treatment.  Instead, the Ruling provides, as quoted by Mr. Reese (emphasis added):

> However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first *considering any explanations that the individual may provide, or other information in the case record*, that may explain infrequent or irregular medical visits or failure to seek medical treatment.  The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.

Thus, the Ruling requires an ALJ only to consider any explanations provided by the claimant and provides that an ALJ might need to recontact or question a claimant at the hearing.  In this case, Mr. Reese was present throughout the hearing and his counsel actively participated by closely, even aggressively, questioning Dr. Lorber about Mr. Reese's condition, and specifically about Dr. Lorber's opinion that a lack of treatment evidence in the Record indicated a level of severity below Listing level.  If there were any explanation for Mr. Reese's lack of treatment that would have been favorable to his case, there was ample opportunity for it to have been presented at the hearing or shortly thereafter.  The ALJ was entitled to so assume.  Any duty under SSR 96-7p for her to consider or inquire into such explanation was satisfied.

In his Brief, Mr. Reese offers such an explanation:  "Plainly the claimant did not have

---

[10] The hearing transcript reveals some acrimonious exchanges between Mr. Reese's counsel, on the one hand, and Dr. Lorber and the ALJ, on the other, concerning this subject (and other subjects), which might account for counsel's raising the issue in his Brief.  However, this suit is not a forum for exercising counsel's frustrations about irrelevant matters.

any funds to do so.  His petition for informa [*sic*] pauperis waiver of the filing fee herein shows his poverty."  (Brief at 24).  This is a disingenuous argument.  Obviously, the time to assert Mr. Reese's indigency as the reason he did not seek treatment was during the administrative hearing, when the issue explicitly was brought up, or shortly thereafter — not now.  Its usefulness and necessity at that time could not have been mistaken and there is no indication that Mr. Reese's indigency at the relevant time was only recently remembered by him or discovered by counsel.  In addition, our review is limited to the administrative record before the ALJ; we do not receive or consider new evidence.  Finally, even on its merits, Mr. Reese's request for *in forma pauperis* status in this case — filed twenty-two months after the hearing and at least three years after the pre-2004 period of non-treatment at issue — does not show, "plainly" or otherwise, that he could not have afforded treatment at the relevant period.[11]

Mr. Reese has not shown that the ALJ's step-three finding that his impairment did not meet or equal Listing 1.02A was legally erroneous or not supported by substantial evidence.

### 3.  The ALJ ignored and only selectively considered important evidence.

Mr. Reese generally argues that the ALJ selected and discussed only the evidence that favored her denial decision; that she failed to even acknowledge evidence tending to prove his disability; and that she failed to consider relevant evidence contrary to her denial decision.  He cites relevant decisions holding that such failures are reversible error.  However, the remainder

---

[11] At the tail end of his step-three argument, Mr. Reese presents caselaw requiring ALJs to meaningfully discuss all of the evidence relevant to an applicable Listing and may not offer only a perfunctory analysis.  (Brief at 24).  He does not explicitly connect this passage to any particular part of his argument.  He does not cite or refer to any other evidence in the Record that demonstrates his indigency as an explanation for lack of treatment and that the ALJ was required to discuss.  If he was intending, instead, to raise a third error in the ALJ's step-three determination, he forfeited it for lack of any factual or legal development.

of his argument consists of descriptions of several reports and parts of reports in the Record that he contends the ALJ ignored or misstated, without accompanying explanations of the significance of these reports that required the ALJ to specifically address them.  Because an ALJ is not required to address every piece of evidence, *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995), but must only articulate her analysis so as to build an accurate and logical bridge between the evidence and her findings and conclusions, *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), a bare listing of evidence not specifically addressed by the ALJ fails to present an issue on review.  Mr. Reese, in making his argument here, was obliged to build his own accurate and logical bridge connecting the omitted evidence and the ALJ's articulation requirement, but failed to do so.  He should not expect the Court to construct his argument for him.  All of his cited evidence was part of the Record before the ALJ and she stated and demonstrated that she reviewed the entire record.  Without a showing that omitted evidence required specific discussion by the ALJ, we find no error.  We have reviewed and will address the items of evidence which Mr. Reese contends the ALJ misstated.[12]

 Mr. Reese asserts that the ALJ misstated the Physical Residual Functional Capacity

---

[12] We add a gratuitous comments on one of Mr. Reese's categories of assertedly ignored evidence.  He cites several reports of medical examinations and procedures relating to his knee osteoarthritis that pre-date his November 2004 train accident.  He describes some of these reports as showing that, by 2003, he had developed knee arthritis and that he had informed his physicians that he was experiencing pain in his lower joints and had difficulty performing daily activities.  However, the ALJ and consulting and reviewing physicians reviewed these records; accepted that Mr. Reese's knee osteoarthritis pre-dated his accident; credited, to a degree, his complaints of knee symptoms; and agreed that his knee problems caused some functional limitations before and after the train accident.  The question was whether his knee arthritis rendered him disabled for a period of twelve months after his alleged onset date (the date of the accident) and Mr. Reese did not attempt to show that the allegedly ignored evidence was significant enough to this question to require specific discussion by the ALJ and we will not make the argument for him.

Assessment form ("PRFC") completed by one of the state-agency physicians by describing it as rating him capable of "standing and walking for 6 hours of an 8 hour workday" but omitting the appended explanatory, but contradictory, note that Mr. Reese was, at that time, "non-weight bearing." (Brief at 25-26). Mr. Reese suggests that it was error for the ALJ to fail to explain the inconsistency between being found able to stand and walk for 6 hours but also being non-weight-bearing. The PRFC form was completed by the reviewing physician on March 31, 2005 as part of the state agency's initial review of Mr. Reese's claim, (R. 215), and it does rate his standing/walking and weight-bearing capacities as described. However, these are not contradictory. What Mr. Reese apparently fails to recognize is that the reviewing physician was providing his determination of Mr. Reese's projected RFC at twelve months after his alleged onset date of November 10, 2004.

The standard for receiving benefits is the existence of a disability that has lasted or is expected to last for at least twelve months. Mr. Reese applied for benefits on December 16, 2004, only one month after the date of the train accident, his alleged onset date. On March 30, 2005, a little over four months after the onset date, a state-agency adjudicator requested medical advice as part of the initial review of Mr. Reese's claim and noted in the request that he was wheelchair bound. (R. 223). At that point, obviously, Mr. Reese's claimed disability could not have lasted twelve months. The next day, Dr. Bastnagel, the agency physician, responded to the request for advice by completing the PRFC on the basis of Mr. Reese's *projected* RFC at twelve months from the onset date. (R. 223 (Dr. Bastnagel noted on the adjudicator's request that he was responding with a "Projected RFC") and 215 (in the section of the PRFC titled "RFC Assessment is for", Dr. Bastnagel marked the box labeled "Date / 12 Months After Onset" and provided the date of "11/01/05")). There was, therefore, no inconsistency that required

17

explanation by the ALJ.  In addition, after noting Dr. Bastnagel's early projection of an RFC, she determined a significantly lower RFC than he had projected for standing and walking "in light of more recent information, including Dr. Lorber's testimony and the claimant's testimony", (R. 25), ultimately deciding on a limitation of standing for one hour and walking for one hour of an eight-hour workday, instead of six hours.  (R. 21).  The ALJ, therefore, accounted for the tentativeness of Dr. Bastnagel's assessment.

Mr. Reese contends that the ALJ misstated a hospital report as recording Mr. Reese describing a pain level of 2 to 4 on a scale of 10 when, "accurately stated," the report records Mr. Reese giving a more severe pain level of 5 to 6.  (Brief at 27).  There was no misstatement. The ALJ wrote that, "[i]n May 2005, . . . [Mr. Reese] reported pain at a level 2 to 4 on a 10 point scale, where 10 is the worst level of pain", (R. 20), and cited the reports at pages 273-75 of the Record, (*id.*).  While one of these reports, a Wishard Hospital report of a May 10, 2005 follow-up visit by Mr. Reese to his orthopedic surgeon, (R. 275), records a pain scale of "5-6," another of these reports, the Wishard Hospital physical-therapy Discharge Summary completed on the previous day, (R. 274), records a pain level of "2-4" as described by the ALJ.  While there is a difference between the two records of pain-level reports, Mr. Reese does not attempt to show why the ALJ was required to credit the May 10th report over the May 9th report.

Mr. Reese also states that the ALJ misstated the orthopedic surgeon's comment in the same May 10, 2005 follow-up report that "the claimant's gait was normal", (R. 20), when "in fact the report stated only:  'Gait (n).'", (Brief at 27; R. 275).  The ALJ translated the surgeon's shorthand of "(n)" as "normal" and it is a reasonable interpretation which is also consistent with the other evidence of Record upon which the ALJ relied tending to show a substantially normal

gait at this time.[13]  Mr. Reese offers no evidence or argument that the surgeon's record has

another meaning.

Mr. Reese contends that the ALJ misstated Dr. Gibson's findings regarding Mr. Reese's

gait.  He argues that the ALJ's statements that Dr. Gibson "failed to note findings of ineffective

ambulation during the examination", (Brief at 28; R. 21), and that Mr. Reese had a normal gait,

(R. 23), are contradicted by Dr. Gibson's observation that Mr. Reese "walks with a somewhat

waddling gait", (Brief at 28, R. 225).  Thus, according to Mr. Reese, the ALJ "erroneously

attempted to define a 'waddling' gait as 'normal' by stating that 'he did not use an assistive

device to walk.'"  (Brief at 29).  It is Mr. Reese who misstates the record.  The ALJ correctly

stated that Dr. Gibson did not note findings of ineffective ambulation during his examination.

Her statement that Mr. Reese "had a normal gait" was not a description of a finding by Dr.

Gibson (in August 2006) but, as noted above, a description of a finding by Mr. Reese's

orthopedic surgeon during a follow-up visit in May 2005.  (R. 275).  Dr. Gibson's description

that Mr. Reese "walks with a somewhat waddling gait", (R. 225), does not, by itself, contradict

either the ALJ's observation that Dr. Gibson failed to note ineffective ambulation or the

orthopedic surgeon's recording of a normal gait:  Mr. Reese's presentation of the dictionary

definitions of "waddling" and "waddle" are unpersuasive as they do not indicate the severe

inability to ambulate effectively as defined in Listing 1.02A and, moreover, fail to take into

account the significance of Dr. Gibson's qualifier of "somewhat."  Dr. Gibson noted specifically

that Mr. Reese did not use an assistive device during his examination, (R. 225); he recorded

normal ranges of hip and knee motion, (R. 228); he concluded that Mr. Reese did not have any

---

[13] Dr. Lorber, the medical expert testifying at the hearing, also interpreted the orthopedic
surgeon's report to indicate a normal gait.  (R. 328).

abnormal objective evidence of residuals from his pelvic injuries, (R. 226), and that his main impairment was his knee osteoarthritis, (R. 230).  He concluded that Mr. Reese could stand for 4 hours and walk for 2 hours at one time, and in total, during an 8-hour workday, (R. 229).  Substantial evidence supports the ALJ's interpretation that Dr. Gibson's report did not support a severe problem with Mr. Reese's gait or an inability to ambulate effectively.

Mr. Reese argues that the ALJ misstated Dr. Gibson's findings on his ranges of knee flexion as being "normal", when "[a]ccurately stated, however, Dr. Gibson stated 'The *general alignment* of the knees is normal . . .'", (Brief at 29).  Again, Mr. Reese simply misreads the record.  While Dr. Gibson did indeed write that "The general alignment of the knees is normal", (R. 226), he also recorded knee-flexion measurements which he described as "normal", (R. 228).

Mr. Reese's final contention of misstatement by the ALJ — that she was confused on the chronology regarding Mr. Reese's rehabilitation, use of assistive devices, and capacity for effective ambulation, (Brief at 29) — is fully discussed above.

Mr. Reese has failed to show that the ALJ ignored or misstated evidence in the Record.

### 4.   The ALJ erroneously determined Mr. Reese's credibility regarding his symptoms of pain, weakness, numbness, and mental illness.

Because of the inherent difficulty of evaluating allegations of functional limitations based on subjective experiences such as pain, the SSA has established a protocol for the evaluation of symptoms.[14]  A basic principle underlying this protocol is that "symptoms cannot be measured

---

[14] Under the Social Security Act, "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment," 42 USC § 423(d)(1)(A) (emphasis added), and a physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques", 42 USC § 423(d)(3).  See also 20 CFR §§ 404.1505(a) and 404.1508.  Because a physical or mental impairment resulting from physical or psychological abnormalities is required, disability cannot

objectively through clinical or laboratory diagnostic techniques . . . ."  SSR 96-7p (Policy

Interpretation — Medical Evidence).  20 CFR 404.1529(c)(3).  Because there are no objective

medical tests for the existence or severity of subjective symptoms, objective medical evidence

can, at best, provide indirect evidence of symptoms by detecting and measuring any physical

effects of the symptoms, such as reduced joint motion, muscle spasm, sensory deficit, and motor

disruption.  *Id.*; 20 CFR 404.1529(c)(2).  Another fundamental principle underlying symptom

evaluation in the regulations is the idiosyncratic nature of the perception and effects of

subjective symptoms.  Individuals can not only feel significantly different intensities of a

symptom resulting from the same impairment, but their functional limitations resulting from

identical levels of a symptom can differ significantly as well.  SSR 96-7p.[15]

By regulation and internal rulings, the SSA has incorporated these principles into a

protocol for the evaluation of subjective symptoms:

> [S]tatements about your pain or other symptoms will not alone establish that you are
> disabled;  there must be medical signs and laboratory findings which show that you
> have a medical impairment(s) which could reasonably be expected to produce the
> pain or other symptoms alleged and which, when considered with all of the other
> evidence (including statements about the intensity and persistence of your pain or
> other symptoms which may reasonably be accepted as consistent with the medical
> signs and laboratory findings), would lead to a conclusion that you are disabled.

20 CFR § 404.1529(a).  This two-step protocol thus prescribes an initial objective threshold

inquiry to ensure the existence of the required causal impairment.  Then guidelines and factors

---

be found on the basis of allegations of symptoms alone, regardless of their credibility.  An
impairment that causes the symptoms must be shown.

[15] "[A]djudicators must recognize that individuals may experience their symptoms
differently and may be limited by their symptoms to a greater or lesser extent than other
individuals with the same medical impairments and the same medical signs and laboratory
findings."  SSR 96-7p (Policy Interpretation).

are provided to direct adjudicators' second-step evaluations of the credibility of claimants'
allegations of the degree of symptoms and limitations experienced.  The second step of the
protocol requires that all available evidence be considered in determining credibility, with
objective medical evidence not accorded determinative weight:

> When the medical signs or laboratory findings show that you have a medically
> determinable impairment(s) that could reasonably be expected to produce your
> symptoms, such as pain, we must then evaluate the intensity and persistence of
> your symptoms so that we can determine how your symptoms limit your capacity
> for work.  In evaluating the intensity and persistence of your symptoms, we
> consider all of the available evidence, including your medical history, the medical
> signs and laboratory findings and statements from you, your treating or
> examining physician or psychologist, or other persons about how your symptoms
> affect you.

20 CFR 404.1529(c)(1).  While the SSA will always seek and consider objective medical
evidence — defined as "evidence obtained from the application of medically acceptable clinical
and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm,
sensory deficit or motor disruption" — it "will not reject your statements about the intensity and
persistence of your pain or other symptoms or about the effect your symptoms have on your
ability to work solely because the available objective medical evidence does not substantiate
your statements."  *Id.*, 404.1529(c)(2).  Claims reviewers must consider all other relevant
evidence, including evidence on the following factors:

> (i)  Your daily activities;
> (ii)  The location, duration, frequency, and intensity of your pain or other
> symptoms;
> (iii)  Precipitating and aggravating factors;
> (iv)  The type, dosage, effectiveness, and side effects of any medication you take
> or have taken to alleviate your pain or other symptoms;
> (v)  Treatment, other than medication, you receive or have received for relief of
> your pain or other symptoms;
> (vi)  Any measures you use or have used to relieve your pain or other symptoms
> (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a
> board, etc.);

> (vii)  Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

*Id.*, 404.1529(c)(3).

> After examining all the evidence, the adjudicator makes a credibility determination:

> We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence . . . .  Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.

20 C.F.R. 404.1529(c)(4).

Mr. Reese argues that the ALJ's credibility determination was erroneous because she "considered Factors 3, 4, and 5, but ignored Factors 1, 2, 6, and 7," (Brief at 32), and she "simply relied on," or had her "primary focus on," the "'objective medical evidence' she only selectively considered," (*id.*).  He does not cite or refer to any specific items of evidence or testimony relating to these "omitted" factors that the ALJ failed to include in her credibility analysis.  However, a review of the ALJ's decision reveals that she did, in fact, articulate her consideration of Mr. Reese's activities of daily living (first factor), (R. 18-19, 20-21, 24, and 24-25), and the location, duration, frequency, and intensity of his symptoms (second factor), (R. 17-19 (mental), 20, 23, and 24 (physical and mental)).  As to the sixth and seventh factors (ameliorative measures and catch-all other factors, respectively), we are unable to determine the ALJ's compliance with the standard without a specification of such ignored ameliorative measures and other factors that exist in the record, and Mr. Reese has, therefore, forfeited this part of his argument.  The ALJ's undisputed consideration of factors 3, 4, and 5, and our finding that she considered factors 1 and 2 demonstrate that she did not simply rely, or primarily focus, on only objective medical evidence as argued in Mr. Reese's second assignment of error in her

23

credibility determination.

Mr. Reese has failed to show that the ALJ failed to properly evaluate the credibility of his

allegations of subjective symptoms.[16]

**5.   The ALJ's step-five determination is erroneous because she improperly altered the medical expert's opinion regarding Mr. Reese's ability to balance.**

Mr. Reese argues that the ALJ improperly altered Dr. Lorber's opinion that Mr. Reese

was limited to "[n]o balancing", (R. 316), to "[h]e can never balance on uneven terrain or on

slippery or wet surfaces", (R. 21, 360, 362-63).  The significance of the difference, according to

Mr. Reese, is that the vocational expert understood Dr. Lorber's no-balancing limitation to

preclude standing and walking, which would preclude Mr. Reese's ability to perform even

sedentary-level jobs.  (R. 361-62).  However, it is unreasonable to interpret Dr. Lorber's no-

balancing limitation to mean that Mr. Reese could not walk or stand because Dr. Lorber also

opined specifically that Mr. Reese could stand and walk for two hours per day, occasionally

ascend stairs and ramps, occasionally carry ten pounds, and bend and stoop.  (R. 316-17).  The

---

[16] At the end of this part of his Brief, Mr. Reese quotes a portion of *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004), suggesting the improbability of a claimant undergoing extensive treatments simply to buttress the credibility of his allegations of subjective symptoms for the purpose of obtaining disability benefits and the improbability that a claimant could be a good-enough actor to trick medical professionals into prescribing drugs and other treatments.  Regardless of the accuracy of these inferences, Mr. Reese only describes and quotes the decision's reasoning but fails to make any application of that reasoning to the facts of his case.  Again, the Court will not make his arguments for him.  We note, however, that there is no dispute that Mr. Reese had real impairments and suffered real symptoms; the question is whether the degree of those impairments and symptoms are disabling.  After his pre-accident knee procedures and the immediate treatments he received for his train-accident injuries, Mr. Reese has not undergone any "extensive treatments" of the type envisioned in *Carradine* as unlikely to be ventured by disability-benefit cheats.  He has also obtained prescriptions for Vicodin, a strong, narcotic pain reliever, from his personal physician since the accident, but the Record also includes his orthopedic surgeon's opinion that narcotics are unnecessary in his case, her opinion that Mr. Reese is narcotic-seeking, and her intention to convince his physician to stop prescribing narcotics.

only environmental limitation he found was wet, slippery, and uneven walking surfaces, (R. 316, 317), and he had no problem with a sit/stand option, (R. 317).  Substantial evidence therefore supports the ALJ's characterization of Dr. Lorber's opinion.

**Conclusion.**

Mr. Reese has failed to show that the Commissioner's decision denying his claims for disability benefits is not supported by substantial evidence or is legally erroneous.  Therefore, judgment will issue affirming the Commissioner's decision.

SO ORDERED:  02/27/2009

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
mulvany@onet.net